# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### SOUTHERN DIVISION
### AT LONDON

| | |
|---|---|
| **RHONDA KAY JACKSON BROWN,** | **CIVIL ACTION NO. 6:14-cv-147-KKC** |
| **Plaintiff,** | |
| **V.** | **OPINION AND ORDER** |
| **TWENTIETH CENTURY FOX HOME ENTERTAINMENT, et al.,** | |
| **Defendants.** | |

*** *** ***

Plaintiff Rhonda Kay Jackson Brown filed a *pro se* complaint against Defendants[1] alleging copyright infringement and unfair competition. Plaintiff holds the copyrights for her original, self-published works *Jackson Road* and *Mother's Son*. Defendants created a movie titled *Devil's Due*. All three works derive from the idea that there may be one or more "anti-Marys" capable of birthing an antichrist through supernatural circumstances. Plaintiff's complaint asserts that *Devil's Due*—a horror film described by critics as derivative of *Rosemary's Baby*—infringes her novel, *Jackson Road*, and related screenplay, *Mother's Son*, but the Court must dismiss this matter because Plaintiff has not demonstrated that this Court has personal jurisdiction over the Individual Defendants or that the legally protectable elements of *Jackson Road* and *Mother's Son* are substantially similar to the legally protectable elements of *Devil's Due*.

---

[1] Plaintiff named Twentieth Century Fox Home Entertainment ("FHE") as a defendant; however, FHE notes that Plaintiff's claims are most likely directed towards Twentieth Century Fox Film Corporation ("FFC") because FFC co-produced the film. For simplicity, the Court will only refer to the corporate defendant—inclusive of both FHE and FFC—as "Defendant Fox." Plaintiff also named John Davis, Matt Bettinelli-Olpin, Tyler Gillett, and Lindsay Devlin as defendants based upon their role in the creation and production of the film. For simplicity, the Court will refer to these defendants collectively as the "Individual Defendants."

## I. BACKGROUND

Plaintiff authored *Jackson Road* and *Mother's Son* and received copyrights for her works in 2006 and 2007. Defendants released *Devil's Due* in 2014. Plaintiff claims that the similarities between her works and *Devil's Due* are "striking" (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 7); therefore, the works are worthy of examination.

### A. Plaintiff's Works

*Jackson Road* is a fictionalized, first-person account of a woman's life spanning many years. The novel begins as the female protagonist, Racquel, describes her upbringing in a small town in Kentucky. Racquel notes that she developed chronic vertigo early in her life as a result of a car accident. Racquel's vertigo is not crippling but repeatedly affects her throughout the novel.

As a young woman, Racquel moves from Kentucky to New York City where she meets her love interest, David. David is a scientist at Biomed, a medical research and development firm. Racquel and David fall in love and marry. The couple spend their honeymoon in Boca Raton, but—unfortunately—shortly after their return to New York marital strife develops as David spends a significant amount of time at work and does not express interest in starting a family. After months of frustration, Racquel returns to Kentucky without David. Racquel is refreshed in Kentucky and reunites with a former love interest, Donyvon. Racquel decides, however, to return to David in New York. Upon Racquel's return to New York, she befriends a priest, Father Willis, who counsels Racquel and helps her interpret her dreams.

Shortly after Racquel returns to New York, David and Racquel fly to Italy with David's boss, Judd. While in Italy, David confesses to Racquel that he was working on research that he felt was immoral. David later tells Racquel that he hid information about

2

his research at Biomed and Father Willis knew how to find the information. Shortly thereafter, David disappears.

Racquel seeks guidance from Father Willis. He explains that Racquel's dreams and David's work are connected, so the two travel to Racquel's hometown to search for additional clues. In Racquel's hometown, Father Willis digs up the information that David had hidden. Father Willis claims that this information leads them to the Dead Sea Scrolls, and both Father Willis and Racquel travel to the Holy Land. While in the Holy Land, Racquel suffers a particularly debilitating vertigo attack and must return to New York. Judd sends his private plane for Racquel, and she is sedated throughout the trip.

After recovering from the vertigo attack, Racquel discovers that she is pregnant. She is startled by this news because she has not been intimate in the many months since David's disappearance. Racquel's pregnancy is otherwise normal, and she gives birth to a son, Jacon. After David's disappearance and presumed death, Racquel and Donyvon reconnect and rekindle their relationship. Racquel is pleased with Donyvon and his role in Jacon's life.

Then, ten years after Jacon's birth, David reappears. He explains that Biomed forced him to perform secret research in Switzerland. David also states that Biomed installed secret cameras in their home to spy on Racquel and threatened David with violence against Racquel if he did not continue his research. Reluctantly, Racquel permits David to become a father figure to Jacon. Jacon succeeds throughout his childhood, graduates from college, and becomes the CEO of Biomed.

The novel concludes with a number of Father Willis's journal entries. He reveals that Judd mysteriously obtained the blood of Jesus Christ and artificially inseminated Racquel. Thus, Jacon shares Jesus Christ's blood. Father Willis also explains that, while

3

Jacon led Biomed, the company created a microchip that could be implanted in a person's brain—the "six six six" chip. Finally, Father Willis reveals that Racquel, like Jesus's mother Mary, had given birth to something supernatural. Racquel had, however, given birth to "the Antichrist."

*Mother's Son* is a screenplay derived from *Jackson Road*. All essential elements are the same between the works. (*See* DE 1 Compl. at 3–4; DE 27-1 Am. Compl. at 1–3.)

**B. *Devil's Due***

*Devil's Due* is a horror film that details a brief, but extremely tumultuous, period in the lives of a young couple, Zach and Samantha. The film utilizes various recording devices, such as consumer video cameras and security cameras, to create a "found-footage," personal milieu. *Devil's Due* begins with a police interrogation of Zach and then flashes back in time to Zach and Samantha's wedding and subsequent honeymoon to the Dominican Republic. During their honeymoon, a cab driver helps Zach and Samantha find a secluded night club where they celebrate all night long and eventually "pass out" from over consumption. The film transitions to a dark scene where Samantha is lying on the floor as mysterious individuals chant and perform a ritual. Zach and Samantha wake up in their hotel room reeling from their respective hangovers and without any memories from the previous night.

After returning from the honeymoon, Samantha discovers that she is pregnant. During the pregnancy, Samantha starts acting strangely, exhibits extreme aggression, displays remarkable physical strength, and performs telekinesis. When Samantha visits her doctor to explain that she senses that something is wrong with the pregnancy, she learns that her original doctor is on a leave of absence, replaced by Dr. Dylan, but is reassured that nothing is amiss.

Later in the pregnancy, Zach and Samantha attend a church service. During the sermon, the priest—Father Thomas—stops talking, stares at Samantha, and blood begins to pour out of her nose. Zach recognizes the cab driver from the Dominican Republic among the fellow congregants and grows suspicious. He watches the videos from the wedding and honeymoon. Zach finds footage of the ritual that occurred while Samantha was passed out and brings this information to Father Thomas. Father Thomas explains that the ritual comes from a sect devoted to summoning the antichrist.

At Samantha's baby shower, she receives an anonymous gift. The gift contains a silver scepter. In a fit of temporary insanity, Samantha goes to the woods where she kills and eats a deer with the scepter and then kills three teenagers who observed her actions.

As Samantha's pregnancy approaches full term, her behavior becomes more erratic. Zach also discovers that the cab driver from the Dominican Republic, along with others, was living in a nearby house and watching Zach and Samantha on closed-circuit television. Zach then returns to his home. He finds Samantha pacing in the bedroom with the scepter in hand. She plunges the scepter into her stomach, a bright light flashes, and Samantha dies. The cab driver from the Dominican Republic and Dr. Dylan enter the bedroom, remove the child from Samantha's womb, knock Zach unconscious, and leave.

The film returns to the police interrogation. Zach is speechless before the police. The film ends with a scene in Paris, where another newlywed couple receives help from the same cab driver from the Dominican Republic who offers to take the couple to an exclusive club outside the city.

## II. ANALYSIS

The parties have filed a number of motions, including: (A) Plaintiff's motion to amend her complaint; (B) the Individual Defendants' motion to dismiss for lack of personal

5

jurisdiction; (C) Defendant Fox's motion to dismiss Plaintiff's complaint for failure to state a claim; and (D) the parties' subsequent motions alleging evidentiary and pleading deficiencies.

## A. Plaintiff's Motion to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to a party to amend its pleading] when justice so requires." But "[a] motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010) (internal quotations omitted).

On January 5, 2015, Plaintiff filed a motion to amend the complaint (DE 27 Pl.'s Mot. to Amend). Her proposed amended complaint and original complaint contain identical factual allegations, but the proposed amended complaint asserts nine additional claims in her prayer for relief. (*Compare* DE 1 Compl., *with* DE 27-1 Am. Compl.) Plaintiff filed her motion after Defendant Fox filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 19 Def.'s 12(b)(6) Mot. to Dismiss) and the Individual Defendants filed a motion to dismiss for lack of personal jurisdiction (DE 21 Defs.' PJ Mot. to Dismiss); but, responding to Plaintiff's motion to amend, Defendant Fox and the Individual Defendants stated that they "do not oppose" the motion "provided that the issues raised [in their respective motions to dismiss] can be heard without the necessity of re-filing a new motion to dismiss that raises the same issues." (DE 31 Defs.' Resp. to Pl.'s Mot. to Amend at 1.)

Here, Plaintiff's proposed amended complaint asserts identical grounds for the Court's personal jurisdiction over all Defendants, and the substantive allegations of the proposed amended complaint—copyright infringement and unfair competition—mirror

6

Plaintiff's original complaint. (*Compare* DE 1 Compl., *with* DE 27-1 Am. Compl.) Because Defendants' motions to dismiss challenge this Court's personal jurisdiction over the Individual Defendants and address the elements of the substantive allegations, the Court shall construe Defendants motions and all accompanying briefing as applicable to the claims set forth in the Amended Complaint.

Accordingly, the Court finds that it is appropriate to give Plaintiff leave to amend her complaint. She did not file her motion in bad faith or for dilatory purposes, amendment does not result in undue delay or prejudice to the opposing parties, and the opposing parties consent to the amendment. *See* Fed. R. Civ. P. 15(a)(2).

## B. Individual Defendants' Motion to Dismiss

The Individual Defendants assert that this Court lacks *in personam* jurisdiction over each individual defendant and, accordingly, the Court should dismiss the action against the Individual Defendants pursuant to Federal Rule of Civil Procedure 12(b)(2). (DE 21 Defs.' PJ Mot. to Dismiss). Plaintiff contends that the Individual Defendants' substantial nationwide activities, coupled with Defendant Fox's distribution of *Devil's Due* in Kentucky, establishes a sufficient basis for this Court's *in personam* jurisdiction over the Individual Defendants. (*See* DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 1–13.)

For a federal court to adjudicate a controversy, the court must have authority over the category of claim (subject-matter jurisdiction) *and* authority over the parties in the action (personal jurisdiction). *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999). If the basis of the federal court's subject-matter jurisdiction stems from the existence of a federal question, then the federal court's exercise of personal jurisdiction over a defendant is proper if it satisfies the forum State's long-arm statute and constitutional due process

requirements. *Cmty. Trust Bancorp, Inc. v. Cmty. Trust Fin. Corp.*, 692 F.3d 469, 471 (6th Cir. 2012).

The plaintiff bears the burden of establishing the Court's personal jurisdiction over each defendant. *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014). "In the face of a properly supported motion for dismissal, the plaintiff may not stand on [her] pleading but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012) (internal quotations omitted). The Court may decide a motion to dismiss for lack of personal jurisdiction upon the affidavits alone, permit limited discovery on the jurisdictional issue, or conduct an evidentiary hearing to resolve factual questions. *Id.* The Court must consider the pleadings and affidavits in a light most favorable to the nonmoving party, and the plaintiff need only state a *prima facie* case for jurisdiction. *Beydoun*, 768 F.3d at 504.

Kentucky's long-arm statute, KRS § 454.210, authorizes a court to exercise personal jurisdiction over a nonresident defendant that allegedly commits one of a precise list of actions. The Kentucky Supreme Court recently reevaluated the requirements for long-arm jurisdiction against a nonresident defendant and clarified that the nine specific provisions provide the limits upon jurisdiction and that the statute is not construed as coextensive with the limits of federal due process. *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 56 (Ky. 2011). "Claims based upon contacts, conduct, and activities which may not fairly be said to meet one of these explicit categories must be held to be outside the reach of the statute, regardless of whether federal due process might otherwise allow the assertion of *in personam* jurisdiction." *Id.* Therefore, evaluating long-arm jurisdiction involves a two-step process: (1) determining whether the cause of action arises from conduct or an activity

8

described in one of the statute's enumerated categories; and (2) if the long-arm statute is applicable, concluding if exercising personal jurisdiction over the nonresident defendant offends his federal due process rights. *Id.* at 57.

Plaintiff has not alleged that the Individual Defendants' actions fall within one of the long-arm statute's nine enumerated categories, and failing to make a prima facie showing and establishing personal jurisdiction with reasonable particularity is a basis to grant the Individual Defendants' motion to dismiss for lack of personal jurisdiction. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 478 (6th Cir. 2003) [hereinafter *Still N The Water Pub.*] (per curiam). But—aware that Plaintiff is proceeding *pro se* and that the Kentucky Supreme Court recently clarified the long-arm statute—it is also clear that Plaintiff's proposed exercise of personal jurisdiction would violate due process; therefore, the Court will proceed to that issue.

Due process operates to limit the power of a court to exercise personal jurisdiction over a nonresident defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *see also Pennoyer v. Neff,* 95 U.S. 714 (1878) (establishing the Due Process limitations on personal jurisdiction).

> The canonical opinion in this area remains *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), in which [the Supreme Court] held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has certain minimum contacts with the [forum] State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (internal alterations and quotations omitted). Personal jurisdiction may be general or specific. *Helicopteros*, 466 U.S. at 414.

1. *General Jurisdiction*

General jurisdiction grants a court the authority to hear causes of action against a defendant even when the cause of action does not arise out of or relate to the nonresident defendant's activities within the forum State. *Id.* A court may exercise general jurisdiction over defendants who are "at home" in the forum State. *Daimler AG*, 134 S. Ct. at 757–58, 760 (affirming that a court cannot exercise general jurisdiction over a natural-person defendant unless *Pennoyer*'s "physical power theory"—consent, presence, or domicile—is met and clarifying that a corporate defendant's home is either the place of incorporation or the principal place of business); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851, 2857 (2011) (holding that a court may exercise general jurisdiction over a corporate defendant only if the defendant is "at home" in the forum State); *Burnham v. Superior Court of Cal., Cnty. of Marin*, 495 U.S. 604, 607–08, 612, 628 (1990) (confirming that service of process to a natural-person defendant briefly present in the jurisdiction, or "tag jurisdiction," is sufficient to confer general jurisdiction). Accordingly, general jurisdiction is appropriate for a natural-person defendant who is present in the forum State, a natural-person defendant who is domiciled in the forum State, a corporate defendant incorporated in the forum State, a corporate defendant with its principal place of business in the forum State, or a defendant that consents to personal jurisdiction. *Daimler AG*, 134 S. Ct. at 757–58, 760; *Burnham*, 495 U.S. at 612.

Here, general jurisdiction is inappropriate because the Individual Defendants do not consent to personal jurisdiction; none of the Individual Defendants are domiciled in Kentucky, *compare Daimler AG*, 134 S. Ct. at 757–58; *Pennoyer*, 95 U.S. at 733, *with* Bettinelli-Olpin Decl., ¶6; Davis Decl., ¶7; Devlin Decl., ¶5; Gillet Decl., ¶6; and none of the Individual Defendants have been present in Kentucky since the alleged infringement

occurred, *compare Daimler AG*, 134 S. Ct. at 757–58; *Burnham*, 495 U.S. at 612; *Pennoyer*, 95 U.S. at 733, *with* Bettinelli-Olpin Decl., ¶12 (stating that he has not visited Kentucky in the past twenty years); Davis Decl., ¶12 (declaring that he has never visited Kentucky); Devlin Decl., ¶12 (asserting that, at most, she has driven through Kentucky in the past); Gillet Decl., ¶13 (confirming that he has never visited Kentucky).

   2. *Specific Jurisdiction*

   Specific jurisdiction provides adjudicatory authority over suits arising out of or relating to the defendant's contacts with the forum State. *Daimler AG*, 134 S. Ct. at 754 (citing *Helicopteros*, 466 U.S. at 414 n.8). Generally, a plaintiff must show that the nonresident defendant has purposefully established significant contact with the forum State and that the plaintiff's cause of action arises out of or is related to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit articulated a three-pronged test to guide this determination:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968).

   The 'purposeful availment' requirement is satisfied when the defendant's contacts with the forum State "proximately result from actions by the defendant *himself* that create a substantial connection" with the forum State, and when the defendant's "conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Beydoun*, 768 F.3d at 505–06 (emphasis in original) (internal quotations

omitted). The purposeful availment inquiry focuses on "whether the defendant has engaged in some overt actions connecting the defendant with the forum [S]tate." *Id.* at 506 (internal quotations omitted). If the plaintiff can demonstrate purposeful availment, then the absence of physical contacts with the forum State will not defeat personal jurisdiction over a nonresident defendant. *See Burger King*, 471 U.S. at 476.

Here, Plaintiff's main contention that this Court has jurisdiction over the Individual Defendants rests on imputing Defendant Fox's distribution of *Devil's Due* in Kentucky to the Individual Defendants. (*See* DE 27-1 Am. Compl. at 2; DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 2–3.) But Plaintiff must establish the Court's jurisdiction over *each* individual defendant and cannot impute a co-defendant's contacts with the forum State to create jurisdiction over the other defendants. *Calder v. Jones*, 465 U.S. 783, 790 (1984).

Plaintiff also alleges that this Court should exercise personal jurisdiction over the Individual Defendants because (1) the Individual Defendants participated in interviews and advertisements for *Devil's Due* that could be viewed in Kentucky, (2) the Individual Defendants' general internet and social media activities connected with *Devil's Due* could be viewed in Kentucky, and (3) other films connected to the Individual Defendants have been distributed in Kentucky. (*See* DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 3–7.) None of these contacts are sufficient to establish purposeful availment.

a)   Interviews and Advertisements

Although advertising is among the activities that constitute 'reaching out' to forum state residents, the Sixth Circuit has clarified that only advertisements "directly targeting or even actually reaching" the forum State satisfy the purposeful availment requirement. *Still N The Water Pub.*, 327 F.3d at 481; *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 89091 (6th Cir. 2002) (finding that *passive* advertisements and other

12

communications that may be accessed in the forum State do not constitute purposeful availment, but that *interactive* communications with forum-State residents can meet the requirement that a defendant purposefully avails himself to the forum State); *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989) (distinguishing between direct and indirect solicitations).

Plaintiff states that the Individual Defendants participated in nationally televised interviews and mentioned *Devil's Due* during the interview, the Individual Defendants were interviewed and photographed by nationally published trade journals covering the release of *Devil's Due*, and the Individual Defendants participated in internet "prankvertisements." (DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 4–6.) Plaintiff does not contend, however, that any of the Individual Defendants *directed* these communications to Kentucky or that these communications were more than passive advertisements with the potential of being accessed in Kentucky. Such communications do "not constitute the purposeful availment of the privilege of acting in" Kentucky. *Neogen Corp.*, 282 F.3d at 890. Therefore, the interviews and advertisements that the Individual Defendants participated in are not contacts that meet the purposeful availment requirement. *Still N The Water Pub.*, 327 F.3d at 481; *LAK, Inc.*, 885 F.2d at 1300.

b) <u>General Internet and Social Media Activities</u>

Internet activity that specifically targets forum-State consumers meets the purposeful availment standard to support personal jurisdiction. *See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 F. App'x 518, 522 (6th Cir. 2006). But general internet communications or use of social media sites—including Facebook, Twitter, and YouTube—does not create a sufficient basis for personal jurisdiction. *See id.*; *see also Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 678 (6th Cir. 2005) (collecting cases); *Neogen Corp.*, 282 F.3d at 890 (holding

that a person's online activity can constitute personal availment of the privilege of acting in the forum State only if the online activity "is interactive to a degree that reveals specifically intended interaction with residents of the state"); *Surface Supplied Inc. v. Kirby Morgan Dive Sys., Inc.*, No. C 13-575 MMC, 2013 WL 2355446, at *4 (N.D. Cal. May 29, 2013) ("Advertising in national publications or on Facebook and Twitter, however, is not sufficient to support a finding of purposeful availment.").

Plaintiff contends that the Individual Defendants promoted *Devil's Due* through various online resources, including Twitter and YouTube. (DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 5–7.) Plaintiff does not assert that these communications specifically targeted Kentucky residents or were interactive to a degree that it is apparent that the Individual Defendants intended to avail themselves of the privilege of acting in Kentucky. The Individual Defendants' use of social media does not create contacts sufficient to support a finding of purposeful availment. *See See, Inc.*, 167 F. App'x at 522; *Neogen Corp.*, 282 F.3d at 890.

### c)   Distribution of *Devil's Due* and Other Films in Kentucky

In *Tobin v. Astra Pharmaceutical Products, Inc.*, the Sixth Circuit found that a defendant could satisfy the purposeful availment requirement based on the existence of a nationwide distribution agreement. 993 F.2d 528, 543–44 (6th Cir. 1993). But the Sixth Circuit later clarified that the defendant must actively solicit such nationwide distribution and that knowledge alone that a third party was likely to distribute nationally is insufficient to establish purposeful availment. *Still N The Water Pub.,* 327 F.3d at 480. A defendant's foresight that a Kentucky plaintiff could be harmed is not enough to create personal jurisdiction. *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1120 (6th Cir. 1994).

14

Plaintiff does not assert that any of the Individual Defendants themselves are distributing *Devil's Due*, or other films connected with the Individual Defendants, in Kentucky. (*See* DE 30 Pl.'s Resp. to Defs.' PJ Mot. to Dismiss at 3–4.) Plaintiff fails to prove that distribution of *Devil's Due*, or any other film, is a *contact* between the Individual Defendants and Kentucky. Mere knowledge of potential distribution to Kentucky is insufficient to establish purposeful availment. *Still N The Water Pub.*, 327 F.3d at 480; *Reynolds*, 23 F.3d at 1120. Thus, the distribution of *Devil's Due* and other films connected to the Individual Defendants does not satisfy the purposeful availment requirement and is not a basis for personal jurisdiction over the Individual Defendants.

* * * * *

Overall, Plaintiff's allegations are too general to satisfy the purposeful availment requirement. Plaintiff does not adduce any evidence that the Individual Defendants took any actions to specifically direct *Devil's Due* to Kentucky. *See Still N The Water Pub.*, 327 F.3d at 480–81 (finding that a defendant's knowledge of and acquiescence to allegedly infringing copyright material being distributed and sold in the forum State is "too random, fortuitous, and attenuated for a finding of purposeful availment"). Because the Individual Defendants have not purposefully availed themselves of the privilege of acting in Kentucky, this Court cannot exercise specific jurisdiction over the Individual Defendants. *Neogen Corp.*, 282 F.3d at 890. Plaintiff has failed to establish the necessary "minimum contacts" for a prima facie showing of either general or specific personal jurisdiction. Accordingly, the Court concludes that Kentucky courts may not exercise personal jurisdiction over the Individual Defendants because the Individual Defendants lack sufficient minimum contacts with Kentucky such that maintenance of this lawsuit would not offend the traditional notions of fair play and substantial justice. *Daimler AG*, 134 S. Ct. at 754.

**C. Defendant Fox's Motion to Dismiss**

Defendant Fox contends that Plaintiff's complaint fails to state a claim upon which relief can be granted and, therefore, this Court should dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 19 Def.'s 12(b)(6) Mot. to Dismiss). Plaintiff asserts that "it is reasonable" to believe that Defendant Fox infringed upon her copyrights and provides additional arguments to support her complaint. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 1–18.)

    *1. Rule 12(b)(6) Standard*

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) if the plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true, but the factual allegations must "raise a right to relief above the speculative level." *Id.* at 555. The complaint must "contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (internal quotations omitted). Failure to include plausible factual allegations for all material elements necessary for recovery warrants dismissal. *Id.*

    *2. Copyright Infringement*

To establish copyright infringement, the plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *Varsity Brands, Inc. v. Star Athletica, LLC*, --- F.3d ----, No. 14-5237, 2015 WL 4934282, at *3 (6th Cir. Aug. 19, 2015) (identifying the second element as a requirement that the plaintiff demonstrate

infringement of the "protectable elements" of a copyrighted work). The first element is not contested here; Defendant Fox acknowledges that Plaintiff owns valid copyrights for her novel, *Jackson Road*, and the adapted screenplay, *Mother's Son*. (DE 31 Defs.' Resp. to Pl.'s Mot. to Amend at 3; DE 33 Def.'s Reply in Supp. of 12(b)(6) Mot. to Dismiss at 5 n.4.) Defendant Fox, however, asserts that Plaintiff has not stated a claim that could plausibly establish that *Devil's Due* copied any protectable elements of *Jackson Road* or *Mother's Son*.

"To establish that [an original work] has been copied, a plaintiff must either introduce direct evidence of the defendant's copying or prove it indirectly by showing that the defendant had access to the plaintiff's work *and* that there is a substantial similarity between it and the defendant's work." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) [hereinafter *UMG Recordings*] (emphasis added). Plaintiff has not introduced direct evidence of copying; therefore, Plaintiff is required to establish *both* access and substantial similarity. *Id.*

        a)  <u>Access</u>

To prove access, a plaintiff must show that "the defendant had an opportunity to view or to copy plaintiff's work." *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (6th Cir. 2004) (internal quotations omitted). The opportunity to view or copy needs to be supported by probative evidence and such evidence must establish that a defendant had a "reasonable possibility," not simply a "bare possibility," to view the plaintiff's work. *Id.*

Here, Plaintiff asserts that Defendant Fox had access to *Jackson Road* and *Mother's Son* because she hired actor Barry Ratcliffe to "personally pitch[ ] Plaintiff's materials[ ] to Hollywood executives and producers" including Defendant Fox and because Lindsay Devlin, writer of *Devil's Due*, "has access to scripts and pitches, studio producers . . . and

executives." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 3.) Defendant Fox contends that these allegations rely on matters outside the pleadings that a court should not consider in deciding whether a plaintiff has stated a claim upon which relief may be granted and that Plaintiff's assertions do not establish access beyond a bare possibility. (DE 32 Defs.' Ev. Objs. at 7–10; DE 33 Def.'s Reply in Supp. of 12(b)(6) Mot. to Dismiss at 2–4, n.3.) But because it is clear that *Devil's Due* does not meet the legal test for substantial similarity to *Jackson Road* or *Mother's Son*, the Court need not address Defendant Fox's objections and contentions.

b) <u>Substantial Similarity</u>

The legal test for substantial similarity involves two steps: (1) identifying which aspects of an artist's work, if any, are protectable, and (2) determining whether the allegedly infringing work is substantially similar to the protectable elements of the artist's work. *UMG Recordings*, 585 F.3d at 274. To complete the first step, the court must "filter" out the non-protectable elements of the artist's work. *Id.* Non-protectable elements include the ideas contained in a work. 17 U.S.C. § 102(b); *see also Int'l News Serv. v. Assoc. Press*, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting) ("The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after voluntary communication to others, free as the air to common use."). "The distinction between an idea and its expression is an elusive one." *Williams v. Crichton*, 84 F.3d 581, 587–88 (2d Cir. 1996). Judge Learned Hand's seminal explanation is especially apt:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a

18

> point in this series of abstractions where they are no longer
> protected, since otherwise the playwright could prevent the use
> of his 'ideas,' to which, apart from their expression, his
> property is never extended. Nobody has ever been able to fix
> [the] boundary [between protectable and unprotectable 'levels
> of abstraction'], and nobody ever can. . . . If Twelfth Night were
> copyrighted, it is quite possible that a second comer might so
> closely imitate Sir Toby Belch or Malvolio as to infringe, but it
> would not be enough that for one of his characters he cast a
> riotous knight who kept wassail to the discomfort of the
> household, or a vain and foppish steward who became amorous
> of his mistress. These would be no more than Shakespeare's
> 'ideas' in the play, as little capable of monopoly as Einstein's
> Doctrine of Relativity, or Darwin's theory of the Origin of
> Species.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (internal citations

omitted).

Non-protectable elements also include any unoriginal elements. *Feist*, 499 U.S. at

345. Finally, scènes à faire—basic plots, incidents, and character traits which necessarily

follow from a common theme—are also non-protectable elements. *See UMG Recordings*, 585

F.3d at 274; *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312,

319–20 (6th Cir. 2004); *Williams*, 84 F.3d at 589 (2d Cir. 1996) (concluding that "[w]hile

both the *Dinosaur World* books and the *Jurassic Park* works share a setting of a dinosaur

zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and

uniformed workers, these settings are classic *scenes a faire* that flow from the

uncopyrightable concept of a dinosaur zoo"); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50

(2d Cir. 1986) (holding that even though a book and a film both "begin with the murder of a

black and white policeman with a handgun at close range; both depict cockfights, drunks,

stripped cars, prostitutes and rats; both feature as central characters third- or fourth-

generation Irish policemen who live in Queens and frequently drink; both show disgruntled,

demoralized police officers and unsuccessful foot chases of fleeing criminals" that these

similarities "are unprotectable as 'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation").

Here, Plaintiff claims that *Devil's Due* meets the legal test for substantial similarity to *Jackson Road* and *Mother's Son*. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 1–18.) Notably, Plaintiff asserts that the female protagonists are substantially similar and that both works introduce the concept of "many Antichrists." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 2, 5, 7, 10–11, 17–18.) Plaintiff describes the similarity in character and plot as follows:

> [A] young woman, newly married, struggling to live her life while forcefully having an inebriating [*sic*] conceived pregnancy placed upon her, while out of the Country, at the hands of Christian heretics, with an Antichrist, using blood and blood symbols to create a good versus evil plot, bringing forth MANY ANTICHRISTS, told in a first-person nature, containing violence and thriller plot.

(DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 11 (emphasis in original).)

Plaintiff's alleged substantial similarity,[2] however, does not demonstrate infringement of the "protectable elements" of a copyrighted work. *Varsity Brands, Inc.*, --- F.3d at ----, 2015 WL 4934282, at *3. The similar elements Plaintiff identifies are ideas, unoriginal, or classic scènes à faire. *See Murray Hill Publ'ns, Inc.*, 361 F.3d at 319–20.

> i. *The common biblical references do not demonstrate substantial similarity; however, the biblical references establish the common choice of setting or situation—scènes à faire—for all three works.*

Plaintiff contends that *Devil's Due* infringed *Jackson Road* and *Mother's Son* because all three works reference the same bible passage. (DE 1-5 Compl. Ex. E at 6; DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 10.) The passage states, "[l]ittle children, it

---

[2] Defendants assert that Plaintiff incorrectly describes the three works to create similarities that do not, in fact, exist among the works. (DE 33 Def.'s Reply in Supp. of 12(b)(6) Mot. to Dismiss at 7–10.) But even the Plaintiff's alleged similarities do not demonstrate infringement of the "protectable elements" of a copyrighted work.

is the last time: and as ye have heard that antichrist shall come, even now are there many antichrists; whereby we know that it is the last time." *1 John* 2:18 (King James). This passage is, however, the *only* verse in the King James Bible that uses both plural "antichrists" and "children," and few other passages in the entire Bible allude to the possibility of multiple antichrists. *See Matthew* 24:24 (King James) ("For there shall arise false Christs . . ."); *2 John* 1:7 (King James) ("For many deceivers are entered into the world, who confess not that Jesus Christ is come in the flesh. This is a deceiver and an antichrist."); *see also Revelation* 13:8, 17:1–18 (King James). Therefore, the idea of multiple antichrists or that an "anti-Mary" could birth an antichrist is not original to any of the works in this lawsuit and is not protectable. 17 U.S.C. § 102(b); *Feist*, 499 U.S. at 345. Further, there is only one verse that refers to both antichrist<u>s</u> and children; accordingly, the works' shared reference to 1 John 2:18 does not constitute infringement. *See Murray Hill Publ'ns, Inc.*, 361 F.3d at 319–20.

> ii.   *The alleged specific similarities in theme, plot, character, and setting do not meet the requirements of substantial similarity.*

Plaintiff claims that all three works share a similar theme. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 2, 5, 7, 9–10, 14.) All three works are about a young woman who is artificially inseminated with an antichrist by various occult or supernatural elements, and all three works insinuate that these events could endlessly repeat. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 2, 5, 7, 9–10, 14.) But these thematic similarities relate to the unprotectable idea of an "anti-Mary" birthing multiple antichrists. Further, the theme of an "anti-Mary" inseminated through a cult ritual is very different from the theme that a crazed head of a medical research and development firm could

21

inseminate an "anti-Mary" with remnants of Jesus Christ's blood. *See Williams*, 84 F.3d at 589.

The plot of the parties' works also does not give rise to a finding of substantial similarity. Plaintiff's works are slow-paced, chronological narratives that detail Racquel's life for many years and, at the end of the works, reveal that Racquel's grown child is an antichrist. *Devil's Due* is a fast-paced narrative without sequential scenes that focuses on Samantha's marriage, honeymoon, immediate insemination by occult members, and—ultimately—failed pregnancy resulting in her death. These plots are not substantially similar, but Plaintiff notes that there are minor, specific similarities. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 7–8, 13, 14–16, 17–18.)

These minor, specific similarities, however, do not suggest infringement. First, Plaintiff contends that the parties' works are substantially similar because the works use "THE BLOOD." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 8 (emphasis in original).) Plaintiff states that on "[p]age 95 of Plaintiff's script *Mother's Son* [she] reveals that the blood of Jesus was used to create the children brought forth, making way for MANY ANTICHRISTS. . . . And in the movie *Devil's Due*, the symbols used to climax the story as the Antichrist is revealed, are written in the blood of mother and Antichrist child . . . ." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 8 (emphasis in original).) Although Plaintiff is correct that there *is* blood in both works, the works *use* the blood in very different ways. This does not establish substantial similarity. *Murray Hill Publ'ns, Inc.*, 361 F.3d at 317. Second, Plaintiff notes that the parties' works include deer. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 13.) A deer causes a car accident in Plaintiff's works, and this car accident induces Racquel's vertigo. Conversely, Samantha manifests the impact of carrying an antichrist in her womb by running out into the forest,

killing a deer, and eating it. This does not establish substantial similarity. *Murray Hill Publ'ns, Inc.*, 361 F.3d at 317. Third, Plaintiff claims that the parties' works use a priest that "holds answers" as a symbol to contrast good and evil and use Christian heretics as "puppet masters" that orchestrate the conspiracy for the female protagonist to birth an antichrist. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 14–16.) A priest providing answers and Christian heretics orchestrating an antichrist-related conspiracy are, however, classic scènes à faire that flow from the uncopyrightable concept of an "anti-Mary" capable of birthing multiple antichrists. *See Murray Hill Publ'ns, Inc.*, 361 F.3d at 319–20. Finally, Plaintiff argues that the works all have similar endings. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 17–18.) At the end of Plaintiff's works, Racquel stands alone and contemplates the horrifying events that she witnessed and fears that her child, a living antichrist, *may* die. At the end of *Devil's Due*, the cab driver welcomes another newlywed couple into his vehicle, suggesting repetition of the film's events, while the police question Zach after Samantha died trying to cut an antichrist out of her womb. This does not establish substantial similarity. *Murray Hill Publ'ns, Inc.*, 361 F.3d at 317.

Plaintiff also asserts that the parties' female protagonists are substantially similar. Plaintiff contends that Racquel is "based on her own real-life non-fictional events, with fiction woven in." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 6.) The Court does not doubt that Plaintiff modeled her female protagonist after her life; however, copyright law only protects the precise *expression* that Plaintiff uses. 17 U.S.C. § 102. Additionally, Plaintiff argues that the female protagonists are substantially similar characters because both women are young newlyweds beginning a new life adventure that suffer health conditions and relationship issues after their respective honeymoons. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 12–14, 17.) Aside from Plaintiff conflating vertigo,

voluntary intoxication, and pregnancy as similar health conditions, Plaintiff's alleged similarities are classic scènes à faire flowing from the uncopyrightable idea of a newlywed female and the various difficulties she may face, especially when she is inseminated with an antichrist. *See Murray Hill Publ'ns, Inc.*, 361 F.3d at 319–20.

The settings of the parties' works do not give rise to a finding of substantial similarity. Plaintiff notes that all works are set in the American South and that the male and female protagonists honeymoon "in warm climates, out of the Country." These similarities are too abstract to establish substantial similarity. *See Nichols*, 45 F.2d at 121.

Finally, Plaintiffs claims that the parties' works are substantially similar because they are first-person narratives. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 10.) Story telling through a first-person narrative, however, is not protectable through copyright. *See Nichols*, 45 F.2d at 121.

>    iii.   *Plaintiff's allegations that the works utilize similar titles and similar advertisements are unfounded.*

Plaintiff contends that the title "*Devil's Due*" is derivative of "*Mother's Son.*" Plaintiff claims that "[i]t is obvious that *Devil's Due*, *Mother's Son*, and "Jackson Road" ALL THREE incorporate the art of the supernatural using humans of the natural realm to bring forth BIBLE PROPHECY." (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 9 (emphasis in original).) These titles, however, are not similar and do not establish substantial similarity. *Murray Hill Publ'ns, Inc.*, 361 F.3d at 317.

Plaintiff also asserts that advertisements for *Devil's Due* mirror the cover art for *Jackson Road*. (DE 29 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss at 18.) Both images portray a young woman wearing a white nightgown. (DE 29-3 Pl.'s Resp. to Def.'s 12(b)(6) Mot. to Dismiss Ex. at 51–52.) Images depicting a work's female protagonist in a white

nightgown does not establish substantial similarity. *Murray Hill Publ'ns, Inc.*, 361 F.3d at 317.

* * * * *

Overall, the Court does not doubt that Plaintiff's works represent years of labor; however, Plaintiff's alleged similarities do not meet the legal tests for copyright infringement. The similarities Plaintiff identifies are either too abstract to warrant copyright protection or are classic scènes à faire—"the indispensable or standard aspects of a work, or those that follow directly from unprotectable ideas." *UMG Recordings*, 585 F.3d at 274. Therefore, even assuming Plaintiff's stated facts and including all of her materials, her filings do not establish the material elements necessary for copyright infringement and dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(6). *D'Ambrosio*, 747 F.3d at 383.

### 3.  *Unfair Competition*

Plaintiff's amended complaint asserts that Defendants' copyright infringement establishes her claim for unfair competition. (DE 27-1 Am. Compl. at 1–2.) Defendants assert that an unfair competition claim premised upon copyright infringement must be dismissed if the plaintiff cannot establish a copyright violation. (DE 19-1 Mem. in Supp. of 12(b)(6) Mot. to Dismiss at 30.)

Plaintiff's unfair competition claim mirrors her copyright claim. (DE 27-1 Am. Compl. at 1–3.) "Where a plaintiff's [unfair competition] claim parallels h[er] copyright infringement claim, a finding of no substantial similarity on the copyright claim precludes the [unfair competition] claim." *Stromback*, 384 F.3d at 300 (citing *Mihalek Corp. v. Michigan*, 814 F.2d 290, 296 (6th Cir. 1987)).

25

This Court determined that Plaintiff cannot establish legal substantial similarity between her works and *Devil's Due*. *See supra* Part II.C.2.b. Therefore, Plaintiff's unfair competition claim based on identical factual allegations is precluded. *Stromback*, 384 F.3d at 300.

### 4. *State Law Claims*

Defendants contend that any potential unfair competition claims based on Kentucky state law are preempted by the Copyright Act. (DE 19-1 Mem. in Supp. of 12(b)(6) Mot. to Dismiss at 31.) The Copyright Act explicitly notes that "all legal or equitable rights that are equivalent to the exclusive rights within the general scope of copyright . . . are governed exclusively by [the Copyright Act.] . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301(a). Plaintiff's legal claims all rely on the Copyright Act; accordingly, any potential state law claims are preempted pursuant to 17 U.S.C. § 301(a).

## D. Additional Motions

After Plaintiff filed her motion to amend her complaint, the Individual Defendants filed a motion to dismiss for lack of personal jurisdiction, and Defendant Fox filed its motion to dismiss for failure to state a claim, Defendants filed two motions to strike evidence and claims from Plaintiff's filings and Plaintiff filed two motions for the Court to deny Defendants' motions. (DE 32; DE 35; DE 37; DE 40). These motions, however, are moot in light of the Court's rulings on the substantive motions. *See supra* Part II.A–C.

## III. CONCLUSION

For reasons stated above, the Court **ORDERS** as follows:

1. Plaintiff's motion to amend her complaint (DE 27) is **GRANTED**;

2.  The Individual Defendants' motion to dismiss for lack of personal jurisdiction (DE 21) is **GRANTED**;

3.  Defendant Fox's motion to dismiss for failure to state a claim (DE 19) is **GRANTED**;

4.  Defendants' motion to strike evidence (DE 32) is **DENIED as moot**;

5.  Defendants' motion to strike portions of the amended complaint (DE 35) is **DENIED as moot**;

6.  Plaintiff's motion to deny Defendants' motion to strike evidence (DE 37) is **DENIED as moot**;

7.  Plaintiff's motion to deny Defendants' motion to strike portions of the amended complaint (DE 40) is **DENIED as moot**; and

8.  This matter is **DISMISSED** and **STRICKEN** from the Court's Active Docket and a judgment shall be issued contemporaneously with this order.

Dated August 27, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

27